Douglas W. Bailey #7-5102
Henry F. Bailey Jr. #5-1681
Andrew D. Bailey #7-6112
BAILEY|STOCK|HARMON|COTTAM|LOPEZ LLP
6234 Yellowstone Road
Cheyenne, WY  82009
307-638-7745
Doug@Performance-Law.com

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF WYOMING

| | |
|---|---|
| TANDIE LINGO<br><br>Plaintiff<br><br>v.<br><br>KENNETH JENSEN in his individual capacity; WYOMING DEPARTMENT OF CORRECTIONS; and WYOMING WOMEN'S CENTER<br><br>Defendants | Case No. _____ |

## COMPLAINT

For her claims of relief against Defendants, Plaintiff, Tandie Lingo, alleges the following:

### SUMMARY OF CLAIM

Throughout the Fall of 2024, Defendant Kenneth Jensen, a correctional officer working at the Wyoming Women's Center, used his position of authority to sexually groom, grope, and abuse Plaintiff, in violation of her Constitutional right to be free of cruel and

unusual punishment. As a result, Plaintiff has sustained serious psychological and emotional harm, for which she is entitled to compensation.

## PARTIES, JURISDICTION, AND VENUE

1. Plaintiff is Tandie Lingo, who resides in Campbell County, Wyoming.

2. Plaintiff resided in and was incarcerated at the Wyoming Women's Center in Lusk, Niobrara County, Wyoming at the time the events described in this COMPLAINT took place.

3. Defendant Kenneth Jensen was a "peace officer" at the time the events described in this COMPLAINT took place, and more specifically, a detention or correctional officer employed by the Wyoming Department of Corrections at the Wyoming Women's Center. *See* Wyo. Stat. § 1-39-112 (waiving governmental immunity for the "tortious conduct of peace officers while acting within the scope of their duties").

4. Defendant Wyoming Department of Corrections (DOC) is a governmental entity with its principal office or place of business in Laramie County, Wyoming. It is vicariously liable for Defendant Jensen's actions under Plaintiff's State law tort claims.

5. Defendant Wyoming Women's Center (WWC) is a governmental entity with its principal office or place of business in Niobrara County, Wyoming. It is vicariously liable for Defendant Jensen's actions under Plaintiff's State law tort claims.

6. This action is brought, in part, under Wyo. Stat. § 1-39-112 of the Wyoming

2

Governmental Claims Act, which waives governmental immunity for the "tortious conduct of peace officers while acting within the scope of their duties."

7. All conditions precedent to the filing of this COMPLAINT have been performed or have occurred. Plaintiff has complied with the statutory requirements of the Wyoming Governmental Claims Act and with all pertinent constitutional requirements, including Wyo. Const. art. 16, § 7, including, without limitation, properly notifying the state of Wyoming, and/or the named subdivisions thereof, of the tort claims that form the subject matter of this COMPLAINT.

8. Within two years of the alleged acts, errors, or omissions committed by Defendants that gave rise to Plaintiff's injuries, Plaintiff presented her claims to Defendants as an itemized statement in writing, certified under penalty of false swearing, at Defendants' business offices.

9. Plaintiff presented the DOC, the WWC, and the General Services Division of the Department of Administration and Information with her STATEMENT OF GOVERNMENTAL CLAIM by certified mail on or about March 4, 2026. She also presented her Claim on the Department of Administration and Information by personal service on or about March 3, 2026.

10. Pursuant to Wyo. Stat. § 1-39-114, this action is being commenced by the filing of this COMPLAINT within one year after the date Plaintiff's STATEMENT OF GOVERNMENTAL CLAIM was presented to and filed with the appropriate

governmental entities pursuant to Wyo. Stat. § 1-39-113.

11. This Court has jurisdiction over the subject matter of this case because it arises under the United States Constitution and other Federal law, namely, 42 U.S.C. § 1983 and the Eighth Amendment of the United States Constitution, which secures the right of an inmate to be free of cruel and unusual punishment, including sexual abuse and assault.

12. This Court also has pendent or supplemental jurisdiction under 28 U.S.C. § 1367, given that the non-federal claims derive from a common nucleus of operative facts and are so related to the federal claims that they form part of the same case or controversy under Article III of the United States Constitution.

13. This Court has personal jurisdiction over Defendants.

14. Venue is proper in this Court, because the facts and circumstances that give rise to this COMPLAINT occurred in Wyoming.

## FACTS

*Constitutional Standards*

15. 42 U.S.C. § 1983 imposes liability on any person or entity acting under color of State

4

law who subjects another to the deprivation of any rights, privileges, or immunities secured by the Eighth Amendment to the United States Constitution, which prohibits the infliction of "cruel and unusual punishments." Peace officers clearly violate this right when they sexually assault an inmate or violate her bodily integrity. *See*, *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998) (citing *Hovater v. Robinson*, 1 F.3d 1063, 1068 (10th Cir. 1993)).

16. Sexual abuse violates contemporary standards of decency and can cause severe physical and psychological harm. *See*, *Boddie v. Schnieder*, 105 F.3d 857, 861 (2d Cir. 1997) (citing *e.g.*, *Women Prisoners of the District of Columbia Dep't of Corrections v. District of Columbia*, 877 F. Supp. 634, 664-67 (D.D.C. 1994); *Jordan v. Gardner*, 986 F.2d 1521, 1524-31 (9th Cir. 1993) (en banc)).

17. "[L]ike the rape of an inmate by another inmate, sexual abuse of a prisoner by a corrections officer has no legitimate penological purpose, and is simply not part of the penalty that criminal offenders pay for their offenses against society." *Boddie*, 105 F.3d at 861 (citing *Farmer v. Brennan*, 511 U.S. 825, 828)

18. The Eighth Amendment "imposes duties on prison officials, who must provide humane conditions of confinement by insuring that inmates receive adequate food, clothing, shelter, and medical care, and by taking reasonable measures to guarantee the safety of inmates…" *Farmer*, 511 U.S. at 828.

*Plaintiff's History*

19. Plaintiff was sentenced on January 4, 2024 to five to seven years in prison after she pleaded guilty to possession of a controlled substance with intent to deliver.

20. Plaintiff has been serving her sentence since January 4, 2024 and was incarcerated at WWC in Lusk, Wyoming until about February 18, 2026 when she was released and transferred to a transitional residential facility in Campbell County, Wyoming.

21. Plaintiff is no longer confined to a Wyoming DOC facility as she reintegrates into the community in Campbell County.

22. Plaintiff had a difficult and traumatic childhood in which she was the victim of multiple and repeated sexual molestations and assaults committed by adult men.

23. As a result, Plaintiff suffered from post-traumatic stress disorder prior to her incarceration in 2024, for which she received counseling and therapy.

24. Plaintiff has struggled with substance abuse for much of her life and has endured multiple abusive relationships.

25. Plaintiff has been incarcerated twice, including her most recent incarceration, during which the facts that give rise to this COMPLAINT took place.

26. As she was serving her most recent sentence (beginning January 4, 2024), Plaintiff was attempting to improve herself, learn how to cope with her past, develop skills for the workplace, and become a more constructive member of society.

27. During her incarceration, Plaintiff completed drug treatment therapy, an online CDL

6

program, and various courses relating to healing trauma, developing healthy relationships, and recognizing and understanding negative internal voices.

28. Tragically, as she was serving her recent sentence, Plaintiff was sexually groomed and assaulted by Defendant Jensen, an employee of the WWC and DOC. These reprehensible acts re-traumatized Plaintiff, triggered her PTSD, and severely injured her emotionally and psychologically.

*Defendant Jensen's Acts*

29. Defendant Kenneth Jensen was employed by the WWC as a correctional officer or peace officer with responsibilities over maintenance during the late summer and fall of 2024.

30. Under color of state law, Defendant Jensen used his position of authority to groom Plaintiff, or prepare her for his sexual advances, sexual comments, sexual harassment, and sexual acts.

31. In about August of 2024, Defendant Jensen began his grooming scheme by developing relationships of trust and making sexual comments towards female inmates, including Plaintiff.

32. The first day Plaintiff met Defendant Jensen, which may have been sometime in August of 2024, he told her that he was "trained at the academy not to f*** the inmates, but

that's like telling a child not to touch a hot stove." He also told the female inmates that if they "took care of him," he would "take care of them."

33. Defendant Jensen began "taking care of" certain female inmates by buying energy drinks, donuts, and other treats, and sneaking them to the inmates in violation of WWC policy.

34. Defendant Jensen was personable with the female inmates and seemingly nice to them, complimenting them, not making them work too hard, and giving them things he wasn't supposed to, like the drinks and treats mentioned above.

35. Defendant Jensen came up with a code word for the female inmates to use when there were other correctional officers or supervisors in the area, which was "bark-bark." This was meant to alert Defendant Jensen to the presence of other individuals who might witness his violations of policy, hear his sexual advances, or see his sexual abuse.

36. While he created relationships of trust with the female inmates, Defendant Jensen planted seeds of distrust relating to other correctional officers and supervisors at WWC. He talked about how he would "protect" the female inmates if they ever got in trouble with the other officers or supervisors, and he asked them if they would "protect" him and "have his back" if he ever got in trouble.

37. Defendant Jensen knew where he could be alone with female inmates, including Plaintiff, away from supervision and out of the sight of surveillance cameras, or in "blind spots."

38. Defendant Jensen began isolating Plaintiff soon after he met her in the fall of 2024. He selected Plaintiff and another female inmate named Montoya for outdoor maintenance, including the building of a snow fence on the prison grounds.

39. Incredibly, Defendant Jensen worked alone with Plaintiff and inmate Montoya on the snow fence. There were no other WWC officers who worked with Jensen on this project or who supervised the work.

40. Defendant Jensen intentionally worked in close proximity to Plaintiff and spoke crudely and explicitly to her while they worked on the snow fence.

    a. Once, while Plaintiff was twisting twine around post and fencing, Defendant Jensen said, "Just you doing normal things makes me hard. I wish you could feel it."

    b. Defendant Jensen asked Plaintiff more than once, "How big do you think my penis is?"

    c. Defendant Jensen told Plaintiff, "You've got me so hot. I wish no one else was around."

41. Plaintiff estimates that over the course of the several days that they worked on the snow fence, Defendant Jensen made these kinds of sexual comments to her over a dozen times.

42. Plaintiff was shocked and scared by Defendant Jensen's comments, but at the same time, she did not know how to react or what to do. She often laughed nervously, trying

to play it off. At times, she told him he "played too much," trying to suggest that he stop his advances. She also reminded him that she was married.

43. Plaintiff appreciated her time working outside in the fresh air and did not want to jeopardize it (it was a coveted position amongst the inmates), nor did she want to risk being punished or retaliated against by Defendant Jensen if she were to report him. She also worried about where his sexual advances might lead, and she worried about being sexually assaulted. She felt "creeped out," "uncomfortable," and "in danger" throughout this period, and her anxiety increased.

44. In order to keep Defendant Jensen at bay, Plaintiff attempted to stay close to inmate Montoya, but Defendant Jensen persisted. He asked both of them whether they found him attractive, and he told Montoya that she was "funny," but that Lingo was "his type" because "she's got the big tits and the big ass."

45. Eventually, Defendant Jensen's sexual harassment escalated to assault. This occurred either in late August or early September of 2024 when Defendant Jensen invited Plaintiff and inmate Montoya into a work truck to drive to a section of fencing that they were to put up. Defendant Jensen drove while inmate Montoya sat in the passenger seat, and Plaintiff sat in the middle. Defendant Jensen intentionally drove over bumps and rough patches on the grounds so he could, as he explained it, see Plaintiff's chest bounce. Plaintiff scooted away from Jensen and leaned against Montoya, but Jensen reached over and grabbed her breast. He then placed his hand

high on her thigh and left it there the rest of the drive, while Plaintiff leaned further into Montoya.

46. Montoya, who witnessed this incident, said, "well, if this is what you're going to do, you're going to have to pay me. I'm her manager." Defendant Jensen laughed at that and nodded.

47. When they stopped the truck and Plaintiff got out, Jensen grabbed her breast again.

48. After they finished their work, and while Plaintiff climbed back into the truck, Defendant Jensen grabbed her buttocks. Montoya saw it and declared that she would be making a lot of money out of this situation, but Plaintiff stopped her. "No way this is happening," she said. "I'm not sleeping with him."

49. A couple days later, while working in the aquaculture facility, Defendant Jensen grabbed Plaintiff's buttocks again.

50. Jensen's conduct ceased when he came under investigation by the DOC, shortly after the incidents described above took place, in approximately September of 2024.

51. It is unclear what the WWC staff knew about Jensen's conduct and when they knew it, but it is Plaintiff's understanding that Jensen's supervisors were aware of his grooming and violations of DOC policy *before* he sexually assaulted her.

52. It is also evident that Jensen was not immediately terminated. While he was being investigated, he still had alone-time with female inmates, during which he coached them on their story and pleaded with them to "get on the same page" or "get their stories

straight." He also reminded them that he would have their back if they had his.

53. During Plaintiff's interview with the investigators, she initially tried to protect Defendant Jensen, still believing that he was somehow on her side and was someone she could trust. When she recognized, however, that Jensen was using her for his own gratification and was an abuser, she came forward with the truth.

54. During her interview with investigators, Plaintiff learned that the DOC had evidence of Jensen sexually harassing and possibly abusing others, and that Jensen had been making payments to female inmates through cash apps, including Plaintiff and Montoya, to keep quiet.

55. Over the next ten months, Plaintiff was never informed as to the status of the investigation or criminal case, nor was she ever consulted as a victim or witness. For those ten months, she lived in fear of retaliation and the possibility that Defendant Jensen might return. For ten months, she was kept in the dark and in limbo, not knowing what happened to her perpetrator or what might happen to her.

56. Two weeks before Defendant Jensen was sentenced, Plaintiff was contacted about making a victim's impact statement at the sentencing hearing, which she did.

57. On or about July 9, 2024, approximately ten months after the investigation began, Defendant Jensen was convicted of sexual battery. A second count of sexual battery was dismissed against him as part of a plea agreement.

*Injuries and Damages*

1. Enduring Defendant Jensen's sexual harassment and assaults was emotionally and psychologically damaging to Plaintiff. It triggered past trauma and exacerbated Plaintiff's mental health conditions, such as anxiety and PTSD.

2. Having reported Jensen's behavior, and being the victim involved in the investigation, Plaintiff's relationships with other inmates and staff deteriorated. She was shunned by other inmates and felt retaliated against by WWC staff.

3. After Jensen was removed from the WWC, Plaintiff began seeing a therapist named Miss Langston. It is believed that Plaintiff received therapy about twice a month from Miss Langston before she was transferred to the transitional facility in Campbell County.

4. Plaintiff has continued to suffer severely from the sexual harassment and assaults, particularly emotionally and psychologically, for which she is seeking therapy and counseling in Campbell County.

5. Plaintiff had been sexually abused in the past and was broken and vulnerable in her position as an inmate.

6. Jensen's sexual abuse reopened old wounds and created new wounds of guilt, shame, low self-worth, anger, depression, anxiety, and fear, all of which represent severe emotional distress and a loss of enjoyment of life.

7. Plaintiff has a particular fear of men and of her environment. She was supposed to be

13

safe inside the WWC but was not, and although she is no longer in the WWC, she constantly wonders what dangers lurk around the corner, and she lives in constant fear and distrust of men.

8.  Plaintiff has sustained non-economic losses, including but not limited to, probable future medical/counseling/therapy expenses, past suffering and emotional distress, past loss of enjoyment of life, future suffering and emotional distress, future loss of enjoyment of life, and permanent psychological and emotional impairment or aggravation of pre-existing mental/emotional/psychological conditions.

*Liability of the Department of Corrections, the Wyoming Women's Center, and Kenneth Jensen*

9.  Defendant Jensen, acting in his personal capacities under color of state law, is liable for his deliberate indifference to Plaintiff's right to bodily autonomy and right to be free from sexual harassment, abuse, and assault, which constitutes cruel and unusual punishment, in violation of the Eighth Amendment of the United States Constitution.

10. Defendant Jensen is liable under Wyoming common law and/or the Wyoming Governmental Claims Act for civil sexual assault and intentional infliction of emotional distress.

14

11. Defendants DOC and WWC are vicariously liable under Wyoming common law and/or the Wyoming Governmental Claims Act for Defendant Jensen's conduct while acting within the scope of his employment as a DOC/WWC correctional officer or peace officer.

## FIRST CLAIM FOR RELIEF:
## CRUEL AND UNUSUAL PUNISHMENT PER SE

12. Plaintiff incorporates the allegations above into this claim.

13. 42 U.S.C. § 1983 imposes liability on any person or entity acting under color of State law who subjects another to the deprivation of any rights, privileges, or immunities secured by the Eighth Amendment to the United States Constitution.

14. A prison official violates an inmate's rights under the Eighth Amendment when two requirements are met. First, the official's conduct must be objectively serious or must have caused an objectively serious injury to the plaintiff. Second, the prison official must have acted with deliberate indifference or reckless disregard toward the plaintiff's constitutional rights, health or safety. *See*, *Farmer*, 511 U.S. at 847.

15. The first element of the deliberate indifference standard is an objective element. A prison official's conduct is "objectively serious" under the Eighth Amendment if it is incompatible with "contemporary standards of decency." *See*, *Helling v. McKinney*, 509 U.S. 25, 32 (1993) (citing *Estelle v. Gamble*, 429 U.S. 97, 103-104 (1976)).

16. The second element of the deliberate indifference standard is a subjective element. That a prison official acted with deliberate indifference or reckless disregard to an inmate's constitutional rights, health or safety may be established by showing that the prison official acted with a "sufficiently culpable state of mind." *See*, *Farmer*, 511 U.S. at 834.

17. With regard to a plaintiff's sexual assault claims, "…an inmate has a constitutional right to be secure in her bodily integrity and free from attack by prison guards. Clearly, plaintiffs' deprivations resulting from the sexual assaults are sufficiently serious to constitute a violation under the Eighth Amendment." *Barney v. Pulsipher*, 143 F.3d 1299, 1310 (10th Cir. 1998).

18. Defendant Jensen, acting in his individual or personal capacity but under color of state law, violated Plaintiff's rights by sexually grooming, groping, harassing, abusing, and assaulting her.

19. Defendant Jensen's conduct was objectively serious because it violated contemporary standards of decency.

20. Defendant Jensen's conduct was deliberately indifferent, callous, or in reckless disregard for Plaintiff's constitutional rights. He acted not to satisfy any legitimate penological purpose, but to satisfy his own sexual desires.

21. Defendant Jensen's conduct is a crime in Wyoming under Wyo. Stat. § 6-2-313(a) (sexual battery) and § 6-2-304(a)(iii) (sexual assault in the third degree) (referencing §

16

6-2-303(a)(vii) (in which the actor is an employee of a correctional system and the victim is an inmate).

22. Because Defendant Jensen acted with deliberate indifference, or reckless or callous disregard for Ms. Lingo's rights, punitive damages are available. *See*, *Smith v. Wade* 461 U.S. 30, 51 (1983).

23. Attorney fees are also available under 42 U.S.C. § 1988.

24. Defendant Jensen's deliberate indifference to Ms. Lingo's rights caused injuries to Ms. Lingo, as described above.

25. As a result of Defendant Jensen's deliberate indifference to Ms. Lingo's rights, Ms. Lingo has sustained economic and non-economic losses, as described above and to be more specifically proven at trial.

## SECOND CLAIM FOR RELIEF:
### CIVIL SEXUAL ASSAULT

1. Plaintiff incorporates the allegations above into this claim.

2. Defendant Jensen, as an employee of a correctional system, submitted Plaintiff, an inmate subject to his authority, to sexual contact. *See*, Wyo. Stat. § 6-2-304(a)(iii) (referencing § 6-2-303(a)(vii)) and Wyo. Stat. § 6-2-313(a).

3. Consequently, Plaintiff has suffered economic and non-economic losses as described above and as will be proven at trial.

4. Because Defendant Jensen was acting within the scope of his employment as a

17

correctional officer at the WWC under the auspices of the Wyoming DOC when these allegations took place, the WWC and Wyoming DOC are vicariously liable.

## THIRD CLAIM FOR RELIEF:
### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

1. Plaintiff incorporates the allegations above into this claim.

2. Defendant Jensen, through his extreme and outrageous conduct, intentionally or recklessly caused severe emotional distress to Plaintiff.

3. Defendant Jensen's conduct was more than mere insults, indignities, threats, annoyances, petty oppressions or other trivialities. His sexual grooming, groping, harassment, abuse, and assault, particularly in the context of his position of authority over Plaintiff, went beyond all possible bounds of decency and is utterly intolerable in a civilized community. In fact, his actions were criminal.

4. Defendant Jensen is, therefore, liable for the severe emotional distress he caused Plaintiff.

5. Because Defendant Jensen was acting within the scope of his employment as a correctional officer at the WWC under the auspices of the Wyoming DOC, the WWC and Wyoming DOC are vicariously liable.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff requests this Court to grant the following:

1. Judgment against Defendants for:

    a.   special damages in an amount consistent with the allegations contained herein and to be proven at trial;

    b.   general damages in an amount consistent with the allegations contained herein and to be proven at trial;

    c.   punitive damages in an amount sufficient to punish Defendants and deter such conduct in the future; and

    d.   attorney fees, costs, and interest, in an amount to be proven at trial; and

2. Any other relief the Court deems appropriate.

DATED March 10, 2026.

BAILEY | STOCK | HARMON | COTTAM | LOPEZ LLP

Douglas W. Bailey
Henry F. Bailey, Jr.
Andrew D. Bailey
*Attorneys for Plaintiff*